**Domingo TURRO, Appellee,**

v.

**The STATE of Texas, Appellant.**

No. 1428–92.

Court of Criminal Appeals of Texas, En Banc.

Dec. 8, 1993.

Clyde M. Marshall (court appointed on appeal), Fort Worth, for appellant.

Tim Curry, Dist. Atty., C. Chris Marshall, Charles M. Mallin and Paul Dickson, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

WHITE, Judge.

Appellant was found guilty of murder and was assessed forty-five years confinement pursuant to jury verdict in the trial court. The Fort Worth Court of Appeals reversed the conviction and rendered judgment of acquittal. *Turro v. State*, 837 S.W.2d 232 (Tex. App.—Fort Worth 1992). Petition for discretionary review was granted to determine whether the legal standard for review of the sufficiency of the evidence was properly applied.

The State brings three grounds for review on this appeal: (1) Whether the Court of Appeals was correct in implicitly concluding that appellant's conflicting version of the crime was sufficient to raise a reasonable outstanding hypothesis of innocence; (2) Whether the Court of Appeals correctly utilized the "reasonable outstanding hypothesis" analytical construct when it failed to view the evidence "in the light most favorable to the verdict" and looked solely to evidence introduced by appellant; (3) Whether the Court

of Appeals utilized the wrong legal standard of review when it conducted a "factual sufficiency" review of the evidence in assessing whether there was sufficient evidence to support appellant's conviction.[1] We will reverse the judgment of the Court of Appeals and remand the cause for a reexamination of the legal analysis.

On May 3, 1987, appellant attempted to drive through a low water crossing, with the victim as a passenger. Flood waters swept the car and its passengers into a rushing creek. Appellant testified that in efforts to save the victim from drowning, he grabbed her around the neck, and that she grabbed him as well. Appellant managed to escape, and he testified that the last time he saw the victim, she was being swept downstream, grabbing at anything she could to stay afloat.

The victim's nude body was discovered the next day. Prior to the medical examiner's autopsy, most law enforcement officials believed the victim's death was the result of a tragic accident. Dr. Nizam Peerwani, the Chief Medical Examiner of Tarrant County, concluded that the victim's death was caused by manual strangulation, not drowning, and ruled the death a homicide.

During the course of the autopsy, Dr. Peerwani noted various physical conditions inconsistent with conditions typically found in a drowning victim. First, the body was completely nude. Dr. Peerwani stated that recovering the body in a nude state was remarkable because from the historical evidence, the deceased was allegedly clothed when she entered the water. He added that it was unusual to see a body that was fully clothed when it entered the water be recovered totally nude. Dr. Peerwani concluded that if the decedent was wearing blue jeans as alleged, she most likely would have been recovered in the jeans, or at least would exhibit physical indications that the jeans were torn off her body.

Additionally, Dr. Peerwani noted that no rigor was present when he first saw the body. He first explained the process and duration of rigor mortis, the manner in which it alters a body's physical appearance, and various environmental factors which influence the period of rigor. He explained that the entire process takes some 36 to 48 hours, at which time the body returns to its flaccid state.

Dr. Peerwani testified that when he saw the body at approximately 2:30 on May 4, 1987, no rigor was present, leading him to conclude the victim was probably dead at least 24 hours before her body arrived at his office. The alleged drowning occurred between 9:00 and 9:30 the evening before, approximately 17 hours prior to the time he first saw the victim's body. Dr. Peerwani therefore maintained the victim was dead prior to the time she entered the flood waters.

Among the external injuries found on the body of Carolyn Williams were "curvilinear" abrasions located predominantly on the left side of the neck. In addition, Dr. Peerwani found that the deceased had pinpoint hemorrhages known as "petechiae" covering her eyeballs, and in the inner linings of the eyelids she had "bulbar" around the eyeball and "palpebral" in the inner linings of the eyelids bilaterally.

Dr. Peerwani described for the jury the significance of the findings. The "curvilinear" abrasions were angular scratches in a fashion consistent with the type of scratch caused by the human fingernail. Such marks, typically found on strangulation victims, are made in an attempt to free a hold on the neck. The marks are usually found on the left side of the neck, as a result of the victim trying to free the hold with his or her right hand.

Dr. Peerwani testified that the "petechiae" hemorrhages present in the eyes of the decedent also classically occur in a manual strangulation where pressure is applied to the neck. These "petechiae" result from rupture of the tiny capillary blood vessels that cause the blood to seep out. Dr. Peerwani testified that this type of injury is not commonly found on a victim of drowning.

---

1. Ground for review no. 3 is refused as improvidently granted. Discussion of this point is not necessary to the disposition of this case.

Finally, upon internal examination, the negative findings Dr. Peerwani made were remarkable. No frothy fluid or hemorrhagic frothy fluid existed in the trachea or the bronchioles, the smaller conduits within the lung tissue. This was significant because in at least ninety percent of drowning cases fluid will get through the mouth, into the nose, into the trachea, and subsequently into the smaller conduits. This fluid combines with the air, producing a tremendous amount of froth. Had decedent been a victim of a wet drowning, Dr. Peerwani believed that he would have found present this frothy edema and he found none.

He also discovered during the autopsy that food had been aspirated into the tracheo-bronchial tree. Dr. Peerwani maintained that if decedent had been a victim of wet drowning and aspirated food from the stomach into her trachea, she would have also been in a position to aspirate water; therefore, she would have had large amounts of frothy hemorrhagic or bloody fluid in the trachea bronchioles which were not present.

Dr. Linda Norton, the forensic pathologist called by the defense, disagreed with Dr. Peerwani and testified that the findings of the autopsy were consistent with an accidental drowning.

First, Dr. Norton testified that the process of rigor mortis was perfectly consistent with the timing of the episode as described by the appellant. She stated that the duration of rigor mortis varies widely from one situation to the next, and that relying on this period of rigor to pinpoint the time of death can be "dangerous." Dr. Norton testified that she observed rigor present in the victim's body in the morgue photographs. She further testified that in recovering the body, it was manipulated and transported, resulting in invariable mechanical breakage of the rigor in the conspicuous regions of the body.

Dr. Norton also refuted Dr. Peerwani's testimony that the nude condition of the body was remarkable. Dr. Norton believed it to be insignificant that the victim's body was found nude. She maintained that the body, having washed downstream, across debris, tree branches, and rocks, could have been partially or fully clothed and yet been recovered completely nude.

Regarding the "curvilinear" marks, Dr. Norton stated that any number of factors, such as limbs or debris in the water, could have caused the scratch marks on the victim. She further testified that the "petechiae" hemorrhages found on the eyes are not unique to victims of strangulation; rather, that they are common in all types of death as a result of simple terminal heart failure.

Finally, Dr. Norton testified that the absence of frothy fluid or edema in the decedent's lung tissue was of no import, because in about 25 percent of drowning victims, no such edema appears.

The evidence presented was consistent with one theory or the other. The jury chose to believe the testimony of Dr. Peerwani, and found the appellant guilty of murder.

The Court of Appeals held that because conflicting evidence existed as to the cause of the victim's death, a reasonable hypothesis existed that the death occurred accidentally. *Turro v. State*, 837 S.W.2d 232 at 234 (Tex. App.1992). The court therefore concluded that any rational trier of fact could not have found the essential elements of the crime of murder beyond a reasonable doubt. *Id.*

## I.

The State contends in ground for review number one that the Court of Appeals was incorrect in implicitly concluding that appellant's conflicting version of the crime was sufficient to constitute a reasonable outstanding hypothesis of innocence.

■ When reviewing the sufficiency of circumstantial evidence in cases tried prior to *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr.App. 1991), this court utilizes the "reasonable hypothesis theory."[2] This analytical construct requires that a conviction based on circum-

---

**2.** The Court of Criminal Appeals in *Geesa v. State*, 820 S.W.2d at 160–61, eliminated the use of "outstanding reasonable hypothesis theory" as an analytical construct. However, the decision was given "limited prospectivity;" thus, this new standard of review is applicable only to cases tried after the *Geesa* decision.

stantial evidence exclude every other reasonable hypothesis except the guilt of the accused. *Butler v. State,* 769 S.W.2d 234, 238 (Tex.Cr.App.1989); *Carlsen v. State,* 654 S.W.2d 444, 447 (Tex.Cr.App.1983). It is not required that the circumstances should, to a moral certainty, actually exclude every other feasible hypothesis, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. See *Carlsen,* 654 S.W.2d at 447.

■ Once a jury finds a defendant guilty of the charged crime, a reviewing court is not authorized to second guess the fact finder as long as a rational trier of fact could conclude that any remaining doubts or outstanding hypotheses are not reasonable. *Boulden v. State,* 810 S.W.2d 204, 206 (Tex. Cr.App.1991). An alternate hypothesis of guilt is not a standard by which evidence sufficiency is measured: it is a guideline for evaluating whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Stated otherwise, the evidence is not rendered insufficient simply because appellant presented a different version of the events. *Anderson v. State,* 701 S.W.2d 868, 872 (Tex. Cr.App.1985).

■ In the case at bar, the State's witness testified that the victim's death was caused by manual strangulation. The appellant then offered a different version of the incident, alleging the death occurred accidentally. The jury accepted the State's evidence and rejected appellant's contrary theory.

The Court of Appeals concluded that a reasonable hypothesis existed that the victim's death could have occurred accidentally, and that the State failed to rebut that hypothesis. We believe the court misapplied the standard of review. The court focused on the existence of an outstanding reasonable hypothesis inconsistent with appellant's guilt rather than basing its review on the decision reached by the jury. Rather than relying on the judgment of the fact finder, the court effectively presumed the appellant's innocence by considering hypotheses of innocence. This method of review has been firmly rejected by this Court. *Jackson v. State,* 672 S.W.2d 801, 803 (Tex.Cr.App.1984). We

will therefore sustain the State's ground for review number one.

## II.

The State contends in ground for review number two that the Court of Appeals misapplied the "reasonable outstanding hypothesis" analytical construct by failing to view the evidence "in the light most favorable to the verdict."

■ When reviewing whether the evidence is sufficient to support a conviction, this Court considers all the evidence in the light most favorable to the verdict. *Madden v. State,* 799 S.W.2d 683, 686 (Tex.Cr.App.1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991); *Butler,* 769 S.W.2d at 238. The relevant question is whether, after so viewing the evidence, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler,* 769 S.W.2d at 238.

■ When reviewing the decision of the jury, the duty of the Court of Appeals is to consider all the evidence in the light most favorable to the prosecution to determine if *that* evidence excludes every other reasonable hypothesis except that of the defendant's guilt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. A reviewing court is not required to determine whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt. *Id.* Although faced with conflicting inferences, a reviewing court must presume that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution. *Matson v. State,* 819 S.W.2d 839, 846 (Tex.Cr.App.1991). In *Matson,* 819 S.W.2d at 846, quoting *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Cr.App. 1988), this Court opined:

"... The court is never to make its own myopic determination of guilt from reading the cold record. It is not the reviewing court's duty to disregard, realign or weigh evidence. This the fact finder has already done. The fact finder, best positioned to consider all the evidence first-hand, viewing the valuable and significant demeanor

and expression of the witnesses, has reached a verdict beyond a reasonable doubt. Such a verdict must stand unless it is found to be irrational or unsupported by ... the evidence, with such evidence being viewed under the *Jackson* light."

■ In the instant case, the jury exercised its prerogative to weigh the evidence, to judge the credibility of the witnesses, and to consider the conflicting theories of the case. The Court of Appeals, however, looked solely to evidence contrary to the verdict and concluded that a reasonable hypothesis other than the appellant's guilt was possible. When understood from this perspective, this construct places the reviewing court in the posture of a "thirteenth juror." *Geesa,* 820 S.W.2d at 159. By failing to view the evidence in the light most favorable to the verdict and substituting its own conclusions, the Court of Appeals effectively repudiated the jury's prerogative.

We believe the Court of Appeals incorrectly applied the "reasonable outstanding hypothesis" construct when it failed to view the evidence in the light most favorable to the verdict. We therefore sustain ground for review number two.

We reverse the judgment of the Court of Appeals and remand the cause to that court for further proceedings consistent with this opinion.

MILLER and MALONEY, JJ., concur in the result.

CLINTON, J., dissents.

MEYERS, J., not participating.